# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **MADISON BURRIS, Individually** | : | **CASE NO: 2:19-CV-815** |
| **And as Administrator of the Estate of** | : | |
| **RICKY LEE BURRIS,** | : | **JUDGE: MICHAEL H. WATSON** |
| | : | |
| **Plaintiff,** | : | |
| **v.** | : | |
| | : | |
| **RANDALL J. DODDS,** *et al.,* | : | |
| | : | |
| | : | |
| **Defendants.** | : | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Ricky Burris was an army veteran who struggled with alcoholism for many years. He entered the Logan County Jail as a pretrial detainee on June 15, 2018, in obvious alcohol withdrawal. Rather than seek or provide medical care to treat his condition, the Defendants placed him in a restraint chair denying him treatment. Mr. Burris suffered for hours as his symptoms worsened until he died. His withdrawal was treatable. His death was preventable. The grief suffered by this plaintiff family was completely avoidable.

Because Mr. Burris was a pretrial detainee, Defendants are incorrect that Plaintiff's claims are subject to the Eighth Amendment. Under the Fourteenth Amendment standard applicable to pretrial detainees, the Defendants are liable if they recklessly failed to act reasonably to mitigate the risk of harm that Burris' alcohol withdrawal posed, and as demonstrated below, there are genuine disputes of material fact precluding summary judgment on these claims. Further, the Defendants are not entitled to qualified or Ohio statutory immunity. Finally, summary judgment on the *Monell* claims must be denied because the policies established by Defendants Sheriff Dodds and Dr. Costin caused patients in alcohol withdrawal to endure unnecessary suffering at the Logan County Jail. Sheriff Dodds also ratified the unconstitutional conduct of jail staff and failed to adequately supervise jail staff. Defendants' Motion for Summary Judgment should be denied in its entirety and all of Plaintiff's claims should proceed to trial.

## I.      STATEMENT OF FACTS

Ricky Burris suffered from chronic alcoholism. (Godwin Dep., D.79, PID#1659-60). About two weeks before his death, he slowed his alcohol intake in an attempt to sober up. His goal was to be present for his daughter Gracie's softball tournament. (Tevis Dep., D.98, PID#2567-2568, 2570-2572; Gracie Burris Dep., D.99, PID#2604). He had reduced his intake so much that his withdrawal symptoms were severe by the morning of June 14th. (D.93-1, PID#2326).

1

Throughout the day, his friends and family noticed bizarre behavior, caused by his withdrawal. In the morning, he hallucinated a tractor, and he was severely shaking and vomiting. (Godwin Depo, D.79, PID#1565, 1574, 1589). Later that day he did not recognize his son, was talking to himself, thought his friend Chuck was standing nearby when he was not, and was picking up pebbles from the street to place in his car. (Hunter Burris Dep., D.80, PID#1620-21).

That night, Burris was observed "wondering around" (sic) and a neighbor called the police, fearing he would be hit by a car. (Watson Report, D.101-2, PID#2798). He was arrested and taken to the Logan County Jail. (Sines Narrative Report, D.100-4, PID#2782-83).

### A. Mr. Burris Died a Preventable, Harrowing Death While in the Custody of the Defendants.

Mr. Burris arrived at the Logan County Jail at approximately 12:14 a.m. on Friday, June 15, 2018. (D.93-1, PID#2311; D.93-3, PID#2374). Defendant Joseph was officer in charge when Mr. Burris arrived. (D.93-1, PID#2326). It was obvious to any reasonable person that Mr. Burris was experiencing severe withdrawal and had a serious medical need. He was sweating profusely, hallucinating, convulsing, shaking, and unstable on his feet. (*Id*., PID#2327; Joseph Depo, D.29, PID#574, 612, 628). Defendant Joseph knew he was not intoxicated but was already far along in the "detox process." (Joseph Interview Tr., D.29-1, PID#729, 731). She also knew that alcohol withdrawal was a serious medical need and could be deadly. (Joseph Depo, D.29, PID#619).

Defendant Joseph spoke with Defendant Nurse Bibart about Mr. Burris over the phone at approximately 12:19 a.m. (D.100-2, PID#2620). Joseph was calling because she knew Burris needed medical care before the nurse was going to come in in the morning. (Joseph Call to Bibart Tr., D.100-6, PID#2789 ("it's going to be coming and it's probably going to be before you get here.")). Joseph told Defendant Bibart that Mr. Burris was "detoxing real bad," "already shaking, a massive sweaty mess." (*Id*.). Like Joseph, Defendant Bibart knew alcohol withdrawal is a serious

medical need and could be deadly. (Bibart Dep., D.32, PID#971). She also knew that monitoring the vital signs of someone going through withdrawal was important. (*Id.*, PID#976). However, Bibart ignored Joseph's actual description of his symptoms and the fact that he was already in withdrawal and assumed that because he had just been arrested that he was not in withdrawal yet, but that she "could presume that he would be… at some point." (*Id.*, PID#1036, 1061-1062).

Instead of coming in to evaluate Burris or having him sent to the hospital, Nurse Bibart instructed Joseph to give Mr. Burris Clonidine and Benadryl to "get him started." (*Id.*, PID#1036). However, after the phone call, Defendant Joseph looked for but could not locate the Clonidine. (Joseph Dep., D.29, PID#593 (explaining that "there wasn't any there")). She never administered Mr. Burris Clonidine and never called Bibart back to report that she could not locate and had not administered the medication. (*Id.*, PID#602 ("I called the nurse one time")). Instead of Clondine, Joseph administered Phenergan as well as two doses of the Benadryl, without any authorization from the nurse. (*Id.*, PID#593, 597-598).

Burris was experiencing auditory, visual, and tactile hallucinations as he entered an imaginary world as a construction worker, laying imaginary carpet in the cell and pounding imaginary nails into the walls. (*Id.*, PID#642). There were multiple reports of severe sweating to the extent that his shirt was soaked. (*Id.*, PID#585; Simpson Dep., D.31, PID#931). Joseph admits she knew he was sweating too much for the amount of water he was drinking and she was concerned about dehydration. (Death Inves., D.100-2, PID#2620; Joseph Dep., D.29, PID#644). By 4:00 a.m., Mr. Burris had fallen once and was so unsteady on his feet that Joseph became afraid he would hurt himself and chose to place him in the restraint chair. (D.26-1, PID#300). Mr. Burris' condition was obviously getting worse and was making Joseph "uncomfortable." (Joseph Dep., D.29, PID#619). Contrary to her training, she did not take Mr. Burris's vitals after he was placed

in the chair nor did she ensure that he was checked by medical every half an hour, as required by Logan County policy. (*Id*., PID#589; D.33, PID#1234; Dodds, D.85, PID#1978-1979).

Despite knowing that Burris had not received the Clonidine ordered by Bibart, that he was hallucinating, and that he was a danger to himself, and admitting that she "probably should have" called, she still did not call nurse Bibart. (Joseph Dep., D.29, PID#601-602, 628, 644). And in fact, Defendant Joseph had previously been disciplined for placing an inmate suffering from alcohol withdrawal in the restraint chair and for failing to a call the nurse about it. (*Id*., PID#696-697; D.29-1, PID#800). If Joseph *had* called back, Bibart would have asked for vitals. (Bibart Depo., D.32, PID#1054). If his vitals were abnormal or if she was concerned about hydration, it is likely she would have sent him to the hospital. (*Id*., PID#1026-1027).

At 7:00 a.m., Defendant Joseph was relieved by first shift officers, Defendants Robert and Fullerton. Mr. Burris' severe withdrawal had only worsened through the night. Roberts was told by Joseph that he was shaking, sweating, and going through withdrawal. (Roberts Dep., D.30, PID#827). She also alerted him that it was "odd," and he was detoxing "quickly." (*Id*., PID#838). Roberts knew Mr. Burris was hallucinating. (*Id*., PID#829-830). For much of the time Mr. Burris was in the restraint chair, he believed someone was trying to attack him while he was restrained. This caused him to scream, attempt to pry himself out of the chair, and say to his hallucinations "I'm going to beat you up, I'm going to get you." (Krepps Dep., D.26, PID#226-228). Mr. Burris "mentioned something about a pocketknife" to Roberts, suggesting he was hallucinating that he was going to be attacked during first shift. (Roberts Dep., D.30, PID#830). Defendant Fullerton then discussed Burris's condition with Roberts. (Fullerton Dep., D. 84, PID#1920-1921).

It was obvious to any reasonable person that Burris was suffering severe withdrawal and had a serious medical need. And in fact, both Roberts and Fullerton knew alcohol withdrawal was

a serious medical need and could be deadly. (*Id.*, PID#1909, 1912; Roberts Dep., D.30, PID#809-810). Jail staff, which included Roberts and Fullerton, were required by jail policy to perform checks on Mr. Burris every ten minutes while he was in the restraint chair, and to have medical staff check on him every thirty minutes. (D.33, PID#1234). However, neither Roberts nor Fullerton physically monitored Mr. Burris in the last twenty-six minutes before he became unresponsive. (Death Inves., D.100-2, PID#2749-2758). Fullerton heard Mr. Burris making "grunting noises" but did not inquire into his condition. (Fullerton Dep., D.84, PID#1921-1922). At some point during that twenty-six minutes, Mr. Burris lost consciousness. He never woke up again.

While Mr. Burris was incarcerated at Logan County Jail, his alcohol withdrawal symptoms were prolonged due to the lack of treatment. He experienced ongoing tremors, which were "not just uncomfortable, but also result in significant ongoing physical exertion." (Mendel Report, D.74-2, PID#1470). Persons experiencing severe alcohol withdrawal often describe terrifying visual hallucinations that appear to be quite real, (*Id.*, PID#1466), and Mr. Burris was seen suffering such hallucinations. For much of the time he was in the restraint chair, he believed someone was trying to attack him while he was restrained. (Krepps Dep., D.26, PID#226-228, Roberts Dep., D.30, PID#830).

The coroner determined that Mr. Burris' cause of death was complications of chronic ethanol abuse and withdrawal. (D.32-1, PID#1132-33). Blood test results demonstrated "profound abnormalities," likely the result of "severe and prolonged sweating." (Mendel Report, D.74-2, PID#1461). The coroner explained in deposition that the immediate cause of death was likely an arrhythmia caused by prolonged increased stimulation because of the increased brain activity. (Schott Dep., D.87, PID#2171). This increased neuronal activity was also the cause of the sweating, tremors, agitation, and hallucinations, and were all caused by his alcohol withdrawal.

(Mendel Report, D.74-2, PID#1467). With hospital treatment, it is more likely than not that Mr. Burris would have survived. (*Id.*, PID#1471).

Mr. Burris's suffering and preventable death was caused by the actions of the individual Defendants, as well as the unconstitutional policies and customs of Logan County. It was obvious to anyone who saw Mr. Burris' condition that he required immediate medical care for his serious medical need. Because Burris could not obtain that treatment at Logan County Jail, he required transfer to a hospital. If Mr. Burris had been sent to the hospital, it is more likely than not Mr. Burris would have survived. (*Id.*, PID#1467).

Crucially, Defendants Sheriff Dodds and Dr. Costin failed to establish adequate policies to treat patients suffering from alcohol withdrawal at Logan County Jail. Defendant Costin knew that moderate to severe alcohol withdrawal should be treated in the hospital. (Costin Dep., D. 27, PID#358-359). He claimed that since Clonidine was not appropriate for persons with severe symptoms, he expected inmates with severe symptoms to be transferred to the hospital. (*Id.*, PID#362-363, 266). However, neither Dodds nor Costin implemented any system for identifying and transferring inmates with severe symptoms to the hospital. Further, Defendant Dodds failed to discipline any of the individual Defendants, despite the myriad policy violations Defendants engaged in, discussed *infra*. (Dodds Dep., D.85, PID#1956). Despite the existence of written policies directing otherwise, the actual practice at Logan County was to allow detainees to suffer moderate and severe withdrawal at the jail without treatment. Medical records taken from twenty-seven inmates who experienced alcohol withdrawal while incarcerated in the Logan County jail indicated that Logan County had a dangerously inadequate policy and practice for managing alcohol withdrawal. (Mendel Report, D.74-2, PID#1462-1463). The failure to maintain adequate policies and practices for managing alcohol withdrawal caused Mr. Burris' preventable death.

## II.    ANALYSIS

Defendants argue that they are entitled to summary judgment on Plaintiff's claims, however in doing so, Defendants fail to accept the facts in the light most favorable to Plaintiff and ignore highly relevant caselaw. As explained in *Greene v. Crawford County*, 22 F.4th 593, 609-614 (6th Cir. 2022), observing symptoms just like Mr. Burris' would make a reasonable official aware of an excessive risk to his health and the failure to seek medical care in that circumstance imposes liability following *Brawner*. The Defendants here are liable for the same reasons.

### A.  Summary Judgment Standard.

Summary judgment is appropriate when the evidence, "taken in the light most favorable to the nonmoving party, shows that there are no genuine issues of material fact and that the moving party is entitled to a judgment as a matter of law." *Hartman v. Great Seneca Fin. Corp.*, 569 F.3d 606, 611 (6th Cir. 2009). See Fed. R. Civ. P. 56(a). "[T]he federal courts have a strong preference for trials on the merits." *Clark v. Johnston*, 413 F.App'x 804, 819 (6th Cir. 2011), citing *Shepard Claims Serv. v. William Darrah & Assocs.*, 796 F.2d 190, 193 (6th Cir. 1986).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Courts should refrain from making determinations of fact on summary judgment. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id*. at 255.  In this case, there are significant and genuine disputes of material fact regarding all of Plaintiff's claims, and for that reason, summary judgment must be denied.

### B.  Defendants Waived Any Argument that Mr. Burris was Not a Pretrial Detainee.

Defendants briefly argue that Burris was not a pretrial detainee, and that, as a result, his claims are analyzed under the Eighth Amendment, not the Fourteenth. However, Defendants did

not raise this argument in their original motion for summary judgment, it was raised for the first time in opposing Plaintiff's Motion for Reconsideration. (Defendants' Memorandum in Opposition to Motion for Reconsideration, D.113, PID#3032). For this reason, they have waived this argument. *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) (explaining that the Sixth Circuit has "found issues to be waived when they are raised for the first time in motions requesting reconsideration or in replies to responses") (collecting cases). *See also Novosteel SA v. United States*, 284 F.3d 1261, 1274 (Fed.Cir. 2002) (finding that plaintiff had failed to preserve an issue for review by not presenting it in its principal summary judgment brief).

While this Court granted reconsideration on the basis of an intervening change in controlling law, reconsideration is *not* a basis for raising "new arguments that could, with due diligence, have been discovered and offered during the initial consideration of the issue." *Playa Marel, P.M., S.A. v. LKS Acquisitions, Inc*., No. C-3-06-366, 2007 WL 3342439, *2 (S.D. Ohio Nov. 6, 2007), citing *McConocha v. Blue Cross and Blue Shield Mutual of Ohio*, 930 F.Supp. 1182, 1184 (N.D. Ohio 1996). Thus, the mere fact that Defendants have been given an opportunity to file a new motion for summary judgment for the purpose of briefing the change in law, does not support raising new arguments in that motion. Defendants must not be allowed to raise new arguments and the argument that Burris was not a pretrial detainee must be considered waived.

However, even if this Court considers this new argument, it must be rejected. Defendants offer no caselaw in support of this argument and point to no evidence from the record in this case. Instead, Defendants point to the Logan County docket for case number 04 AD 0181, against Mr. Burris, however, this does not establish that it is undisputed that Burris should be considered a convicted prisoner. Defendants appear to believe that the fact that Burris was ordered to serve 55 days in 2011 is conclusive, however it is not, because Burris *was not serving those 55 days* when

he was arrested years later, on June 15, 2018. What little can be discerned from the docket indicates that he was arrested on a warrant and was incarcerated *pending a hearing*. This suggests that he was being held pretrial, pending the determination of that hearing.

The status of persons who were convicted at some point in the past and are not serving a period of incarceration directly arising out of that conviction but rather have been arrested at a later time for some basis related to that original conviction, such as for a probation violation, is a complicated question that courts have struggled with. *See Walker v. Southern Health Partners*,-- F.Supp.3d -- , 2021 5988359, *14 (E.D. Ky. Dec. 17, 2021), citing *Hill v. Cnty. of Montgomery*, No. 9:14-cv-00933, 2018 WL 2417839, at *2 (N.D. N.Y. May 29, 2018) ("Whether to classify an individual detained for a suspected probation violation as a pretrial detainee or a convicted prisoner is an 'unresolved and difficult question.' "). The Sixth Circuit has not directly addressed the issue. *Id*. at *14. Courts grappling with this have generally drawn a line between those entitled to a hearing and those for whom custody is an automatic punishment. *See Kellum v. Bernalillo County*, 250 F.Supp.3d 846, 853 (D.N.M. 2017); *Arnold v. Gonzalez*, No. 18-cv-02193, 2019 WL 4306195, at *4 n. 1 (D. Colo. Sept. 10, 2019), *aff'd*, 829 F. App'x 867 (10th Cir.2020). Defendants have cited no authority holding otherwise, and in fact have cited no authority at all. Because this issue was not raised and litigated prior to this time, there is no record on which to conclusively determine Burris' status. However, the fact that the docket indicates that Burris "WILL BE LODGED UNTIL A HEARING CAN BE SCHEDULED" indicates that the latter is the case here. *Tevis, et al. v. Burris*, Logan C.P. No. 04 AD 0181 (April 4, 2018). Because Defendants have failed to show that it is undisputed that Burris was a post-conviction inmate, he must be treated as a pre-trial detainee

9

for the purpose of summary judgment, and subject to the Fourteenth Amendment standard.[1]

### C. Defendants Violated the Fourteenth Amendment when they Denied Mr. Burris Adequate Medical Treatment.

Prior to *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), the Supreme Court had not established what standard applied to the constitutional claims of pretrial detainees. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 fn. 8 (1989) (reserving decision on the question), citing *City of Revere v. Massachusetts General Hosp.*, 463 U.S. 239, 243-245 (1983). It was only in the *absence* of a standard that the Court analogized to the Eighth Amendment claims of post-conviction prisoners, because as a matter of due process, pretrial detainees must be treated "at least" as well as prisoners. *Revere*, 463 U.S. at 244. However, as explained in *Kingsley*, while the Eighth Amendment protects a prisoner from cruel and unusual punishments, a pretrial detainee "cannot be punished *at all*." *Kingsley*, 576 U.S. at 400 (emphasis added). Thus, the Court found that the standard applicable to a pretrial detainee's Fourteenth Amendment claim was an objective one,

---

[1] If this Court, despite granting reconsideration for the purpose of considering this case under the Fourteenth Amendment *Brawner* standard, chooses to apply the Eighth Amendment standard on the basis that it finds that it is undisputed that Ricky Burris was a convicted prisoner, this Court should still deny summary judgment to Defendants Joseph and Roberts on Plaintiff's constitutional and state law claims. In its Order, this Court relied on an inadvertent mistake of fact that Joseph had made a second call to Bibart in granting summary judgment to Defendant Joseph. (Order, D.111, PID#3010). The Court explained that when his condition worsened, she called the nurse again and thus did not act with deliberate indifference. (*Id.*, PID#3010-3011). However, Defendants Joseph and Bibart both agree that only one call took place. (Joseph Dep., D.29, PID#602; Bibart Dep., D.32, PID#1037). Because Defendant Joseph did *not* rely on a second phone call with nurse Bibart, a jury could find that her failure to seek medical assistance for Mr. Burris was deliberately indifferent under the subjective Eighth Amendment standard.

While this Court pointed out that the failure to present facts to the Court will not generally become grounds for reconsideration, (Order, D.116, PID#3052-3053), Defendants did not argue in their Motion that Joseph ever made a second call in their original Motion. (Motion, D.94, PID#2505-2506, 2508, 2510, 2513, 2522-2523, 2525). Thus, there was no reason for Plaintiff to believe that it was necessary to dispute this undisputed fact. Because this was not a failure of Plaintiff to demonstrate that there was a dispute of fact this Court should consider the fact that there was only one phone call in resolving Defendants' Motion. And if this Court applies the subjective Eighth Amendment standard, it should deny Defendants Joseph and Roberts summary judgment.

rather than the subjective Eighth Amendment standard. *Id*. at 397.

*Kingsley* concerned excessive force, however the Court's "clear delineation between claims brought by convicted prisoners under the Eighth Amendment and claims brought by pretrial detainees under the Fourteenth Amendment" demonstrated that it was "no longer tenable" to continue to apply the Eighth Amendment standard to "constitutionally distinct groups" in any context. *Brawner v. Scott County, Tenn*., 14 F.4th 585, 596 (6th Cir. 2021). Accordingly, in *Brawner*, the Sixth Circuit applied this standard for the first time to pretrial detainee medical claims. There, the Sixth Circuit held that to satisfy the objective Fourteenth Amendment standard, the defendant must have acted "recklessly in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Id*. at 596, citing *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). This is the Second Restatement of Torts definition of civil tort recklessness and is an objective standard. *See Farmer*, 511 U.S. at 836, citing Prosser and Keeton § 34, pp. 213-214; Restatement (Second) of Torts § 500 (1965). This standard has been in use for more than fifty years and was adopted, for example, by the state of Ohio to define civil tort recklessness more than thirty years ago. *Thompson v. McNeill*, 53 Ohio St.3d 182, 105-106 (1991). Thus, it is clear that this standard is not new but long established. It requires "more than negligence but less than subjective intent." *Brawner*, 14 F.4th at 596 (internal citations omitted).

To meet Plaintiff's burden to show that the Defendants violated his constitutional right to adequate medical care, she must show "(1) that [Burris] had an objectively serious medical need; and (2) that [the defendant's] action (or lack of action) was intentional (not accidental) and [he or she] either (a) acted intentionally to ignore [Burris'] serious medical need, or (b) recklessly failed to act reasonably to mitigate the risk the serious medical need posed to [Burris], even though a reasonable official in [the defendant's] position would have known that the serious medical need

posed an excessive risk to [Burris'] health or safety." *Id.* at 597. As explained in *Trozzi v. Lake County, Ohio*, 29 F.4th 745, 755 (6th Cir. 2022), this does allow for the "consideration of an official's actual knowledge of the relevant circumstances." This is just like in excessive force cases, where the objective standard asks whether an officer's actions were reasonable "in light of the facts and circumstances confronting them" but "without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). The analysis is based on what was known to the officer at the time, but instead of asking whether the officer subjectively perceived the risk, the question is whether the risk was "so obvious that it should be known." *Brawner*, 14 F.4th at 596-597. In other words, the court looks "to what the particular officer actually knew to gauge what a reasonable officer would have understood about the detainee's condition." *Trozzi*, 29 F.4th at 756, citing *Greene* , 22 F.4th at 614.

While Defendants question whether this new standard extends to the failure to act,[2] *Brawner* explicitly held that a defendant can be liable where they "recklessly failed to act." 14 F.4th at 597. Here, because Ricky Burris had an objectively serious medical need and there are disputes of fact regarding each Defendant's reckless failure to mitigate the risk that medical need posed to Mr. Burris, summary judgment must be denied.

### 1. Mr. Burris' Severe Withdrawal Was an Objectively Serious Medical Need.

Defendants make a perfunctory argument that Mr. Burris did not have an objectively

---

[2] Defendants also cite to Eighth Amendment cases that do not apply to the issues before this Court. For example, *Schack v. City of Taylor*, 117 F.App'x 469 (6th Cir. 2006), was decided long before *Brawner* and as a result, does not use the correct standard. While a case using the Eighth Amendment standard may still have precedential value on *other* issues, Defendants cite to *Schack* for its recitation of the subjective Eighth Amendment standard. (Motion, D.119, PID#3084, citing *Schack*, 117 F.App'x at 472 (questioning whether the officers "actually foresaw" the risk of harm)). However, Plaintiff does not need to demonstrate that the Defendants "actually foresaw" the risk, only that they "recklessly failed to act reasonably to mitigate" a risk that "a reasonable official… would have known." *Brawner*, 14 F.4th at 597.

serious medical need, based on the fact that withdrawal is not *necessarily* a serious medical need. (Motion, D. 119, PID#3082-3083). However, it is clear that the severe withdrawal that Mr. Burris was experiencing constituted a serious medical need, not the least because it resulted in his death. *Hinneburg v. Miron*, 676 F. App'x 483, 486-487 (6th Cir. 2017). The Sixth Circuit has "unequivocally recognized" that there is "[no] genuine question of law related to a detainee's right to receive medical treatment for acute alcohol withdrawal." *Kindl v. City of Berkley*, 798 F.3d 391, 402 (6th Cir. 2015). Thus, when alcohol withdrawal is severe enough to involve shaking, sweating, and hallucinations, that is a sufficiently serious condition that requires immediate medical treatment. *See e.g. Smith v. County of Lenawee*, 505 F.App'x 526 (6th Cir. 2012) ("there is no question that plaintiff established the objective component" where plaintiff suffered alcohol withdrawal with shaking, sweating, and hallucinating). Because Plaintiff has presented evidence that Mr. Burris was suffering from these exact symptoms, it is clear that he was suffering from an objectively serious medical need. Defendants ignore this evidence, instead offering their own version of the facts. This merely identifies that there is a dispute that needs to go to trial.

While this Court did not explicitly address this element in its Opinion and Order, it found that Defendant Roberts was not entitled to summary judgment, which necessarily included finding that there was a factual dispute regarding whether Mr. Burris' had an objectively serious medical need. (Order, D.111, PID#3015-3016). There has been no change in the law on this element, and so there is no basis for reconsidering this element. Because Plaintiff has presented evidence that Mr. Burris was suffering from acute alcohol withdrawal, he was suffering from an objectively serious medical need and had a constitutional right to receive medical treatment for his condition.

### 2. Defendant Joseph Recklessly Failed to Act Reasonably to Mitigate an Obvious Risk to Mr. Burris' Health.

The question here is whether Plaintiff has presented evidence that a jury could rely on to

find that Joseph "recklessly failed to act reasonably to mitigate" a risk that "a reasonable official… would have known." *Brawner*, 14 F.4th at 597; *Greene*, 22 F.4th at 609. Defendants fail to accept the facts in the light most favorable to Plaintiff, ignoring considerable disputes regarding whether Joseph believed Burris was intoxicated or in withdrawal, whether she observed symptoms of acute withdrawal, whether administering Phenergan was an accident, and whether she monitored Burris' medical condition while he was in the restraint chair. Accepting the facts in the light most favorable to Plaintiff, it is clear that Defendant Joseph's actions were reckless as defined by *Brawner*.

Defendant Joseph admits that she did not believe Burris was intoxicated but rather was going through withdrawal. (Joseph Interview Tr., D.29-1, PID#729, 731). She observed him hallucinating, convulsing, and shaking, and further admits that she knew that those symptoms indicated that hospital admission was necessary for treatment. (D.93-1, PID#2327; Joseph Depo, D.29, PID#554-555, 574, 612, 628, 644). She further knew that alcohol withdrawal could be deadly. (*Id.*, PID#619). Defendant Joseph was therefore aware of sufficient facts that a reasonable official should have known that Burris' withdrawal posed an excessive risk to his health. *Greene*, 22 F.4th at 609-613 (a jury could find that detainee's need for immediate medical attention was known or so obvious it should be known when official was aware detainee was experiencing alcohol withdrawal and observed symptoms including hallucinations).

Defendant Joseph then recklessly failed to mitigate that risk at multiple points. First, as officer in charge, she allowed Burris to be admitted to the Logan County Jail, despite his need for immediate medical treatment. Per Logan County policy, 74.01.2, Medical Disposition, #12: "Detained persons brought to the facility who show, "any evidence of injury or illness" while medical staff is not on duty will not be admitted without being examined or treated by a medical facility or emergency medical technician. (D.30, PID#1231). Though there was no medical staff

on duty, and nurse Bibart would not be in until morning, Joseph admitted him anyway.

Then, Defendant Joseph called the off-duty nurse, Bibart, because she knew Burris needed medical care before he would be seen by a nurse in the morning, (Joseph Call To Bibart Tr., D.100-6, PID#2789), and received instructions to treat Burris with Clonidine, however Joseph *did not give him Clonidine* and *did not call Bibart back* when she could not find the Clonidine. While Defendants argue that Joseph cannot be liable because she was relying on a medical professional, there are facts demonstrating that Joseph did *not* rely on Bibart's guidance, and in fact knowingly did not follow it. Defendants rely on Joseph's testimony that giving Burris Phenergan instead of Clonidine was a mistake, implying simple negligence. However, the simple fact is that the record shows, and Joseph admits, that before giving Burris Phenergan, Defendant Joseph *looked for the Clonidine*. (Joseph Dep., D.29, PID#593). If Joseph had mistakenly believed that Bibart had ordered Phenergan, as argued by Defendants, Joseph would never have gone looking for Clonidine in the first place. Thus, because Joseph admits that she looked for Clonidine, a jury could find that she understood that Bibart had told her to administer Clonidine and she recklessly disregarded that guidance. Then she replaced Bibart's guidance with her own lay opinion to administer an entirely different prescription drug, Phenergan, as well as an unprescribed extra dose of Benadryl.

Next, Burris' condition continued unabated and worsened through the night, and Defendant Joseph failed to seek medical assistance to address this severe problem. She observed Burris' hallucinations and his condition made her "uncomfortable." (*Id.*, PID#619, 642). He fell and told her it would "be a bad one." (*Id.*, PID#586). She was concerned about dehydration and worried that he would hurt himself by falling again. (*Id.*, PID#602, 644). She even admits that she "probably should have" called the nurse back. (*Id.*, PID#601). However, she did *not* call the nurse back and did not seek medical assistance. (*Id.*, PID#602). Defendants attempt to dismiss this "lapse

in communication" as not rising to the level of a constitutional violation, but do not apply the elements described in *Brawner* or support their argument with any relevant case law.[3] Because she was aware that he had not improved after the call with Bibart, a jury could find that Joseph recklessly failed to mitigate the risk to Burris when she failed to seek further medical assistance. *Greene*, 22 F.4th at 612-613 (defendant could be reckless because he did not seek medical assistance after observing that detainee's condition continue unabated after evaluation). While Defendants point to disputed evidence that Joseph perceived that he "wasn't worse, but he wasn't getting better," (Roberts Dep., D.30, PID#827), the fact that his serious medical need was not improving is sufficient for a jury to find that her failure to seek medical assistance was reckless. *Greene*, 22 F.4th at 611 (defendant knew detainee's condition "had not improved").

In lieu of seeking medical assistance, Joseph put him in a restraint chair. While he was in the restraint chair, Burris did not receive any examination or monitoring by Joseph or any medical professional. Joseph admits that she did not check his vital signs. (Joseph Dep., D.29, PID#589). Each supervisor that was questioned agreed that by failing to check his vital signs Joseph was violating her training regarding monitoring of persons in withdrawal. (Dodds, D.85, PID#1978-1979; Fitzpatrick Dep., D. 86, PID#2039-2040). While Joseph checked his circulation while in the restraint chair, she did nothing to monitor or treat his *withdrawal*. (Joseph Dep., D.29, PID#589, 645). Evaluation by non-medical personnel is not a substitute for medical evaluation. *See Greene*,

---

[3] Defendants cite *Mantell v. Health Prof'ls Ltd.*, 612 F.App'x 302, 304 (6th Cir. 2015), however this case does not use the *Brawner* standard and there, the failure to pass on information to a nurse was not necessary because the nurses had assessed the plaintiff themselves. Here, Bibart never assessed Burris. Likewise it is unclear what relevance *Linden v. Washtenaw County*, 167 F.App'x 410 (6th Cir. 2006), has here, as it does not use the *Brawner* standard and it has no factual similarities. Finally, the only post-*Brawner* case cited in *Hyman*, however it does not support Defendants' proposition and does not involve a failure to call a nurse when symptoms of a serious medical need continued. 27 F.4th at 1237-1238.

22 F.4th at 609-613 (jury could find defendants recklessly failed to mitigate for failure to seek medical assistance even though detainee was seen by mental health and checked on by jail staff). Astonishingly, Defendant Joseph had been disciplined for this very combination of actions – putting a detainee suffering from alcohol withdrawal in a restraint chair and failing to call the nurse when she did so – and still did the same here. (Joseph Dep., D.29, PID#696-697; D.29-1, PID#800). A jury could easily find that a reasonable officer in Joseph's position, knowing what Joseph knew, including her training, her prior discipline, and Burris' symptoms, would have perceived the risk to Mr. Burris and the failure to call the nurse or to otherwise seek medical assistance was recklessly failing to mitigate that risk.

Defendants cite to *Britt v. Hamilton County*, No. 21-3424, 2022 WL 405847 (6th Cir. 2022), in support of Joseph's use of the restraint chair, however, there are critical differences in the facts of these cases. Most notably, in *Britt*, the detainee was evaluated by medical professionals, who determined he was stable and could be placed in the restraint chair. *Id.* at *4. Here, Defendant Joseph knew that Burris had *not* been examined by a medical professional, knew that he had not received the medication ordered by nurse Bibart, and knew that his condition had not improved and was worsening. However, instead of seeking medical assistance in response to his obvious medical need, she put him in a restraint chair.

Defendants attempt to distinguish *Greene* on the basis that the detainee there went longer without medical care, but this is not persuasive. The key to the analysis in *Greene* was the awareness of a need for medical care and the failure to seek that care. In fact, one defendant in *Greene* was denied summary judgment despite being on duty only 90 minutes, a fraction of the time Joseph watched Burris continue to suffer – the key was that regardless of the amount of time that defendant was present or how long the plaintiff had gone without care, the defendant had

17

reason to know to that there was an excessive risk to the health of the plaintiff. In *Greene* the defendant knew the plaintiff was not improved overnight and continued to hallucinate, just like Defendant Joseph. *Greene*, 22 F.4th at 611.

The cases Defendants rely on are not on point. In *Hyman v. Lewis*, 27 F.4th 1233, 1237 (6th Cir. 2022), no defendant had any knowledge that the plaintiff was concealing drugs or had overdosed on drugs, and thus had no reason to know that there was a risk to health. And in *Howell v. NaphCare, Inc*., No. 1:19-cv-373, 2022 WL 740928, *1-2 (S.D. Ohio March 11, 2022), the detainee got in a fight, received medical treatment, was examined by a nurse, and was believed to be having a psychiatric episode. There as well, there was no obvious medical risk that was being disregarded. Finally, Defendants misrepresent *Trozzi* when they assert that "simple inaction" is insufficient to meet the Fourteenth Amendment standard. The passage referenced discusses accidental failures, not situations where the defendants had reason to believe that failing to act would put the detainee at risk. *Trozzi*, 29 F.4th at 757 (analogizing to excessive force claims where an accidental Taser discharge or an officer tripping and falling on a detainee does not establish a constitutional claim). In addition, *Trozzi* makes clear that training is relevant to the analysis of recklessness. *Id*. at 756-757. Defendant Joseph violated her training when she failed to take Mr. Burris vital signs. (Dodds, D.85, PID#1978-1979; Fitzpatrick Dep., D. 86, PID#2039-2040). She also violated her training when she failed to call the nurse back. (Fitzpatrick Dep., D.86, PID#2042; Torsell Dep., D.83, PID#1840, 1844; Costin Dep., D.27, PID#413; Dodds Dep., D.85, PID#1964-1965). Finally, she violated her training when she gave medication without authorization from a nurse. (Fitzpatrick Dep., D.86, PID#2041-2042; Costin Dep., D.27, PID#413).

As explained in *Brawner* and reiterated in *Greene*, where a defendant "recklessly failed to act reasonably to mitigate the risk," a defendant will be liable under the Fourteenth Amendment.

*Greene*, 22 F.4th at 607, citing *Brawner*, 14 F.4th at 597. Because Defendant Joseph repeatedly failed to seek medical care, ignored medical guidance the one time she did seek care, and failed to follow her training in many respects, a jury could find that Joseph recklessly failed to act reasonably to mitigate the risk that Burris' acute alcohol withdrawal posed. For this reason, summary judgment must be denied.

### 3. Defendant Roberts Recklessly Failed to Act Reasonably to Mitigate an Obvious Risk to Mr. Burris' Health.

This Court has already denied summary judgment to Defendant Roberts, because Defendant Roberts knew that Burris was going through severe withdrawal, was hallucinating, and needed to be checked frequently but then failed to adequately monitor Burris. (Order, D.111, PID#3016). The Sixth Circuit then *lowered* the burden Plaintiff had to prove to impose liability. *Brawner*, 14 F.4th at 596-597. Thus, there is no way that the intervening change in law could impact the denial of summary judgment to Roberts. He was denied summary judgment because a jury could find that he acted with deliberate indifference, and the same evidence is more than enough to demonstrate that he "recklessly failed to act reasonably to mitigate" a risk to Mr. Burris that "a reasonable official… would have known." *Brawner*, 14 F.4th at 597; *Greene*, 22 F.4th at 609. Defendants make no argument why the denial of summary judgment to Roberts should be reconsidered. However, even if this Court reconsiders the claims against Roberts, the same outcome is necessary because accepting the facts in the light most favorable to Plaintiff, it is clear that Roberts recklessly failed to act to mitigate the risk to Mr. Burris.

Defendants argue that awareness of withdrawal is not necessarily enough depending on the severity of symptoms, but they ignore significant disputes of fact regarding Roberts' knowledge of the excessive risk to Burris. Here, Defendant Roberts was responsible for Burris, knew he was going through withdrawal, knew he was hallucinating, knew he "wasn't getting better," knew

19

withdrawal could be deadly, violated jail policy in failing to monitor Burris, and waited for the nurse to come in, instead of obtaining medical care immediately. (Roberts Dep., D.30, PID#810, 820, 827, 829-832, 838; Death Inves., D.100-2, PID#2749-2758; D.33, PID#1234). As explained in *Greene*, when a defendant was aware that a detainee is experiencing alcohol withdrawal, observed them hallucinating, knew that medical treatment was necessary, but chose to merely wait for the nurse to come in, "there are genuine disputes of fact regarding whether [that defendant] was deliberately indifferent" following *Brawner*. *Greene*, 22 F.4th at 612. For the same reasons, Defendant Roberts is not entitled to summary judgment here.

Defendants cite to *Hyman* for the proposition that deviating from jail policy is not necessarily enough to establish a constitutional violation, but the difference between this case and *Hyman* is that Defendant Roberts had reason to believe that Burris was at risk, and the defendant in *Hyman* had "no reason" to know there was any risk. *Hyman*, 27 F.4th at 1238. It is this knowledge of the risk that distinguishes cases like *Hyman* from cases like this one and *Greene*. In addition to Roberts' awareness of Burris' symptoms and violation of policy, he also violated his training when he failed to take vitals while Mr. Burris was in the restraint chair, which further supports Defendant Roberts' recklessness in failing to monitor Mr. Burris. (Dodds, D.85, PID#1978-1979; Fitzpatrick Dep., D.86, PID#2039-2040). *See Trozzi*, 29 F.4th at 756-757. Finally, Defendants argue that the video footage demonstrates that checking on Burris from down the hallway was feasible. This inference is not permitted on summary judgment and should be rejected for the same reason this Court rejected it the first time. (Opinion, D.111, PID#3015). Where there is no "blatant contradiction" between the plaintiff's version of the facts and the video, the "[i]nferences supported by… the video, remain drawn in favor of the non-moving party." *Scott v. Harris*, 550 U.S. 372, 381 n. 8 (2007). Regardless, Burris' condition required immediate *medical*

attention, not jail staff watching him from down the hall. Because a jury could find that Defendant Roberts recklessly failed to act reasonably to mitigate an excessive risk of harm to Mr. Burris, summary judgment must be denied.

### 4. Defendant Fullerton Recklessly Failed to Act Reasonably to Mitigate an Obvious Risk to Mr. Burris' Health.

The question here is whether Plaintiff has presented evidence that a jury could rely on to find that Defendant Fullerton "recklessly failed to act reasonably to mitigate" a risk that "a reasonable official... would have known." *Brawner*, 14 F.4th at 597; *Greene*, 22 F.4th at 609. Accepting the facts in the light most favorable to Plaintiff, it is clear that he did.

Defendants argue that Fullerton's "awareness that [Burris was] experiencing alcohol withdrawal" is not automatically enough to establish a triable dispute. However, Defendants ignore disputes of fact as to how much Fullerton knew about the severity of Burris' condition. It is disputed how much Defendant Fullerton knew about the severity of Burris' withdrawal. If a jury found that he knew that Burris was experiencing severe withdrawal and had not received medical care, a jury could find that Fullerton recklessly failed to act reasonably to mitigate a serious risk of harm by not seeking medical assistance for Burris. *Greene*, 22 F.4th at 609-611. Fullerton knew Burris was detoxing from talking to Roberts, and should have known that it was severe when Roberts asked him "what the worst person [he] had ever seen detox" was. (Fullerton Dep., D.84, PID#1920-1921. Fullerton heard Burris grunt as he hallucinated in the chair. (*Id*., PID#1922). He knew that withdrawal could be deadly. (*Id*.). Defendant Fullerton violated his training when he failed to take vitals while Mr. Burris was in the restraint chair. (Dodds, D.85, PID#1978-1979; Fitzpatrick Dep., D. 86, PID#2039-2040). This further supports Defendant Fullerton's recklessness in failing to monitor Mr. Burris. *Trozzi*, 29 F.4th at 756-757. For these reasons, a jury has to determine whether a reasonable official with Fullerton's knowledge would have been aware

of the excessive risk to Burris' health by failing to seek medical care.

### 5. Defendant Bibart Recklessly Failed to Act Reasonably to Mitigate an Obvious Risk to Mr. Burris' Health.

The question here is whether Plaintiff has presented evidence that a jury could rely on to find that Defendant Bibart "recklessly failed to act reasonably to mitigate" a risk that "a reasonable official… would have known." *Brawner*, 14 F.4th at 597; *Greene*, 22 F.4th at 609. Defendants fail to accept the facts in the light most favorable to Plaintiff, ignoring considerable disputes regarding whether Bibart had sufficient information that Mr. Burris was suffering from acute alcohol withdrawal. Accepting the facts in the light most favorable to Plaintiff, it is clear that she did.

Joseph told Defendant Bibart that Burris was "detoxing real bad," "already shaking," a "massive sweaty mess," and that he probably going to require medical treatment "before you get here." (Joseph Call to Bibart Tr., D. 100-6, PID#2788-2789).[4] Joseph also told her "he's already talking," which a jury could find meant that he was already hallucinating. (*Id*., PID#2789). Like the other defendants, Bibart knew that withdrawal was a serious medical need and can be deadly. (Bibart Dep., D.32, PID#971). Defendant Bibart also knew that monitoring the vital signs of someone going through withdrawal was important. (*Id*., PID#976). And as a nurse with extensive experiencing caring for persons suffering from alcohol withdrawal in the hospital setting, she knew more than enough to recognize that Burris needed to be fully evaluated. (*Id*., PID#972-974).

Despite this, Defendant Bibart chose not to conduct any evaluation of Burris, over the phone or in person, did not request a history, did not request vitals, did not inquire further about symptoms. (Joseph Call to Bibart Tr., D.100-6, PID#2788-2791). She did not request updates, have Joseph track vitals or symptoms and chose not to come in to assess Mr. Burris herself. (*Id*.,

---

[4] Defendants argue that Bibart's experience was that detainees usually take a few days before active withdrawal starts, however, this is disputed by what Defendant Joseph directly told Bibart about Burris' condition.

PID#2788-2789; Bibart Dep., D.32, 1060-1061). She ignored the information given to her by Defendant Joseph, and assumed that Burris was not in withdrawal yet. Dr. Mendel opined that Bibart's failure to evaluate Burris or to order him to be sent to the hospital was a "marked deviation from the applicable standards of care" because what Bibart was told by Joseph indicated that Burris was suffering from "highly symptomatic alcohol withdrawal that represented at least moderate withdrawal." (Mendel Report, D.74-2, PID#1467). He opined further that "[m]edical evaluation was clearly needed." (*Id.*). While she instructed Joseph to give him medication, a jury could find that she had sufficient knowledge of the severity of his condition to know that he needed immediate medical assessment that could not wait until morning. *Greene*, 22 F.4th at 609-610 (finding defendant could be found to have recklessly failed to act reasonably by not seeking medical assistance based on knowledge he was experiencing a medical issue and had not been seen by a medical professional). Further, Defendant Bibart's additional training and experience with withdrawal is relevant to the analysis of a reasonable nurse in Bibart's situation. *See Trozzi*, 29 F.4th at 756-757. If Defendant Bibart had gone in to examine Burris herself, it is likely that she would have sent him to the hospital based on concerns over dehydration and if he had been sent to the hospital, it is more likely than not that he would have survived. (Bibart Dep., D.30, PID#1026-1027; Mendel Report, D.74-2, PID#1467).

Because a jury could find that Defendant Bibart's failure to immediately evaluate or refer Burris for care recklessly failed to mitigate a serious risk of harm to Mr. Burris, summary judgment must be denied.

### 6. Defendants Sheriff Dodds and Dr. Costin Recklessly Failed to Act Reasonably to Mitigate an Obvious Risk to Mr. Burris' Health.

Defendants make only one argument that Defendants Dodds and Costin are entitled to summary judgment – that they had no personal involvement with Mr. Burris. (Motion, D.119,

PID#3091-3092, 3094). However, Defendants misunderstand the nature of personal involvement necessary to sustain an individual-capacity claim. While individual supervisory defendants cannot be held liable based on *respondeat superior*, and can only be liable based on their own actions, that does not actually require that Sheriff Dodds or Dr. Costin ever personally interacted with Burris or had "personal knowledge" of him. *Taylor v. Michigan Dept. of Corrections*, 69 F.3d 76, 81 (6th Cir. 1996). Rather, if Sheriff Dodds or Dr. Costin performed their jobs in a manner that created a "substantial risk of serious harm to a particular class of persons," then they can be liable, regardless of "whether he knew who the particular victim turned out to be." *Id*.

The question here, then, is whether Plaintiff has presented evidence that a jury could rely on to find that Defendants Dodds and Costin "recklessly failed to act reasonably to mitigate" a risk to "a particular class of persons" that "a reasonable official… would have known." *Brawner*, 14 F.4th at 597; *Greene*, 22 F.4th at 609; *Taylor*, 69 F.3d at 81.[5] Accepting the facts in the light most favorable to Plaintiff, it is clear that they did.

As sheriff, Defendant Sheriff Dodds was the final policymaker at Logan County Jail, including in regards to staff discipline. (Dodds Dep., D.85, PID#1953). Defendant Dr. Costin was the policymaker specifically with respect to the medical policies and procedures at the Logan County Jail. (Costin Dep., D.27, PID#351). However, Dr. Costin and Sheriff Dodds failed to establish adequate policies to treat patients suffering from alcohol withdrawal at Logan County Jail. Instead, Dodds and Costin maintained alcohol withdrawal protocols at the jail that were

---

[5] In *Taylor*, an Eighth Amendment case, the Court discussed the standard in terms of "actual knowledge," consistent with the subjective Eighth Amendment standard. 69 F.3d at 81. Applied to a Fourteenth Amendment case, subjective knowledge is not required. Thus, liability is available when the official puts "a particular class of persons" at risk, however, a Fourteenth Amendment claim under *Brawner* would require that a reasonable official would have known that a particular class of persons was being put at risk, rather than requiring "actual knowledge" of the risk. *See Brawner*, 14 F.4th at 597; *Taylor*, 69 F.3d at 81.

dangerous and wholly inadequate.

While Defendant Costin had utilized benzodiazepines to reduce hallucinations and mitigate severe alcohol withdrawal symptoms for years, he chose to change that practice in 2017. (*Id.,* PID#362-363). The new formulary required that clonidine be administered instead. Defendant Costin chose this drug knowing that clonidine was not effective for severe alcohol withdrawal and was not FDA approved. (*Id.,* PID#365-366). Clonidine is not effective for hallucinations. (Bibart Dep., D.32, PID#996-997). The reliance on Clonidine, an adjunct medication, deviates from the standard of care. (Mendel Report, D.74-2, PID#1468). This failure goes beyond simple medical malpractice; it is an "extreme deviation from the standard of care." (*Id.*). As a direct result of this policy, a class of vulnerable persons, specifically Logan County detainees experiencing severe withdrawal, including Mr. Burris, endured unnecessary suffering.

However, the reckless actions of Dodds and Costin go beyond Costin's reliance on Clonidine. Defendant Costin knew that moderate to severe alcohol withdrawal should be treated in the hospital. (Costin Dep., D.27, PID#358-359). He claimed that since Clonidine was *not* appropriate for persons with severe symptoms, he expected inmates with severe symptoms to be transferred to the hospital. (*Id.*, PID#362-363). However, neither Dodds nor Costin implemented any system for identifying and transferring inmates with severe symptoms to the hospital. And in fact, despite the fact that Defendant Costin knew the Logan County Jail was not equipped to care for patients suffering from severe withdrawal, Defendant Dodds and Defendant nurse Bibart testified that persons experiencing alcohol withdrawal and hallucinations did *not* need to be sent to the hospital and could remain in the jail. (Dodds Dep., D.85, PID#1966-1967; Bibart Dep., D.32, PID#1056-1057). And in fact, there is evidence that the actual practice was to deny patients suffering moderate and severe withdrawal transfer to a hospital. It was common for inmates in

25

withdrawal to experience hallucinations in the jail: a review of twenty-seven other inmate patient records demonstrate that it was common for patients to undergo severe withdrawal while at Logan County Jail, without being transferred to a hospital. (Mendel Report, D.74-2, PID#1462-1463). These records demonstrate that Logan County frequently puts inmates at risk by failing to monitor blood pressure, failing to provide effective medications such as benzodiazepine and even the basic vitamin Thiamine, and failing to document patient history. (*Id*., PID#1462). Finally, Defendant Dodds never required any quality assurance or actual assessment of the jail treatment of inmates in withdrawal, and Dr. Costin never provided a written review of the medical care given at the jail to Sheriff Dodds, allowing this practice to continue. (Costin Dep., D.27, PID#374).

A jury could find that failing to establish appropriate policies to treat alcohol withdrawal or to have those in need of treatment sent somewhere that could treat them was a reckless failure to act reasonably to mitigate the obvious risk to detainees suffering moderate to severe alcohol withdrawal. Unlike the defendant in *Harrison v. Scott*, No. 2:18-cv-1023, 2022 WL 912252 (S.D. Ohio March 29, 2022), whose only involvement was the "ministerial" act of signing contracts, Defendants Sheriff Dodds and Dr. Costin "personally had a job to do, and [they] did not do it." *Taylor*, 69 F.3d at 81. Likewise, *Newberry v. Melton*, 726 F.App'x 290, 295 (6th Cir. 2018), is not on point. Defendants rely on *Newberry* for the proposition that Sheriff Dodds' "failure to physically assist" Mr. Burris cannot be a basis for liability because he was "not responsible for patrolling the jail," (Motion, D.119, PID#3092), however, the claim against Sheriff Dodds is not based on his failure to personally tend to Mr. Burris, but on his failure to institute adequate policies, which he is responsible for.

Because Defendants Dodds and Costin were personally involved in failing to establish adequate policies to treat detainees experiencing moderate and severe withdrawal, and that failure

caused Mr. Burris to go without treatment for his acute alcohol withdrawal, causing him unnecessary suffering and death, summary judgment must be denied.

### 7. Mr. Burris' Right to Adequate Medical Treatment was Clearly Established Long Before 2018.

Defendants argue that because *Brawner* modified the standard applicable to Fourteenth Amendment claims, that that necessarily means that the law could not have been clearly established, citing *Stein v. Gunkel*, No. 19-159, 2021 WL 5098685 (E.D. Ky. Nov. 2, 2021). However, the fact that the state of mind requirement changed does not necessarily impact whether the *right* was clearly established.

As explained in *Greene*, Mr. Burris' right not to have his serious medical needs disregarded by a medical provider or an officer was clearly established, because it is "well established" that acute alcohol withdrawal is an objectively serious medical need. *Greene*, 22 F.4th at 615 (analyzing conduct occurring in 2017), citing *Kindl*, 798 F.3d at 401 (2015); *Smith*, 505 F. App'x at 533 (2012); *Speers v. County of Berrien*, 196 F. App'x 390, 394 (6th Cir. 2006) ("Expert testimony showed that delirium tremens, if untreated, is often fatal—which assuredly makes it a 'serious' medical condition."). In fact, in *Smith*, in 2012, the Sixth Circuit denied qualified immunity to "an officer who failed to seek medical assistance for an individual suffering from delirium temens in a situation of obvious illness even when the officer knew that the detainee was on withdrawal medication and being observed." *Greene*, 22 F.4th at 615, citing  *Smith*, 505 F. App'x at 535. Just like in *Smith* and *Greene*, Mr. Burris was suffering severe alcohol withdrawal involving shaking, sweating, and hallucinating, and for the same reasons, Mr. Burris' right to medical assistance for his acute alcohol withdrawal was clearly established. For this reason, Defendants are not entitled to qualified immunity.

### D. Defendant Logan County is Subject to Liability under *Monell.*

Defendant Logan County is also liable for its policies and practices where they cause constitutional violations. To establish municipal liability under 42 U.S.C. § 1983 and *Monell v. Dept. of Social Serv.*, 436 U.S. 658 (1978), Plaintiff must demonstrate that Logan County's policy, custom, or procedure was the moving force behind the constitutional violations. *City of Canton v. Harris,* 489 U.S. 378 (1989); *Broyles v. Corr. Med. Servs., Inc.*, No. 08-1638, 2009 WL 3154241, at *2 (6th Cir. Jan. 23, 2009), citing *Ford v. County of Grand Traverse*, 535 F.3d 483, 495 (6th Cir. 2008). Plaintiff can prevail on her *Monell* claim independent of whether Defendants are granted qualified immunity. *Garner v. Memphis Police Dep't*, 8 F.3d 358, 365 (6th Cir. 1993).

There are four general methods of proving a municipality's illegal policy or custom: the plaintiff may prove "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Jackson v. City of Cleveland*, 925 F.3d 793, 828 (6th Cir. 2019) (citing *Burgess*, 735 F.3d at 478). The first two methods of demonstrating municipal liability are based on city policy itself being unconstitutional. The latter two are based on a failure to act that is deliberately indifferent to the rights of persons who come into contact with County officials. See *North v. Cuyahoga County*, 754 F.App'x 380, 384 fn. 2 (6th Cir. 2018), citing *Garner*, 8 F.3d at 365-366 (noting that the deliberate indifference test is used to analyze failure-to-train claims but not affirmative policy or custom claims).

Moving force causation is a question of fact for the jury. *Matulin v. Village of Lodi*, 862 F.2d 609, 613 (6th Cir. 1988); *Oklahoma v. Tuttle*, 471 U.S. 808, 833 n.9 (1985) (Brennan, J., concurring); *Powers v. Hamilton Cnty. Public Defender,* 501 F.3d 592, 608 (6th Cir. 2007).

Because Plaintiff's constitutional rights were violated and those violations occurred as a result of Defendant Logan County's policies, practices, and customs, summary judgment must be denied.

### 1. Defendant Logan County is Liable for the Actions of its Final Policymakers.

Here, Logan County maintained a constitutionally inadequate policy of failing to treat and undertreating alcohol withdrawal, because Defendant Dodds and Costin were final policymakers. A "deliberate choice to follow a course of action" made by an official "responsible for establishing final policy with respect to the subject matter in question" will impose liability if that course of action is shown to be the moving force or cause of the plaintiff's harm. *Burgess v. Fischer*, 735 F.3d 462, 479 (6th Cir. 2013), citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) (plurality opinion). Under this method, even a single act binds the municipality because it is the act of the policymaker. *Id*. Thus, for all the reasons Defendants Dodds and Costin are liable as individuals, as final policymakers their actions are imputed to Logan County, and Logan County is liable for those actions. Defendants make no argument in favor of summary judgment on this claim. Summary judgment must be denied.

### 2. Defendant Logan County Ratified Defendant Joseph's Actions Because Her Actions were Consistent with Logan County Policy.

Defendants argue that Logan County is not liable based on an "inadequate investigation" because the County did "meaningfully investigate the event." (Motion, D.119, PID#3095). However, Plaintiff's claim has never been based on the *failure* to investigate, but on the fact that the County *did* investigate and found no substantive violations and no staff was disciplined. This is evidence that that these actions were consistent with existing Logan County policy.

"[W]hen a subordinate's decision is subject to review by the municipality's authorized policymakers, [the municipality has] retained the authority to measure the official's conduct for

conformance with their policies." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). "If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." *Id*. In other words, when the final municipal policymaker reviews the employee's discretionary actions, he measures those actions against the municipality's official policies. If he approves the employee's actions and does not discipline or reprimand the employee, his approval is final and demonstrates that the employee followed official policy. In a ratification case, therefore, the municipality's liability is not based on the policymaker's *ex post facto* approval of the employee's actions. Rather, it is based on the municipality's existing policy, which the employee followed in carrying out his actions. The official's ratification merely confirmed that the employee was acting according to official policy.

The investigations conducted here, by two Logan County officials and one from Hancock County, all documented extensive evidence of acts in violation of Logan County written policies, but failed to identify all but the most inconsequential violations because they were not in violation of Logan County's actual policies. The review by Detective Watson from Logan County documents a narrative of what took place but does not actually assess the actions taken for compliance with Logan County's policies or procedures. (Watson Narrative Report, D.101-2, PID#2798-2801). The report from Hancock County notes a failure to adequately document but does not find substantive violations and concludes that there was no evidence that the acts of any Logan County staff contributed to Mr. Burris' death. (D.93-1, PID#2307). The review by Lieutenant Furlong from Logan County similarly found failures to document but no substantive violations, concluding that Mr. Burris was checked "regularly," despite the failure to comply with policy, that Defendant Joseph complied with the detox policy, despite failing to give Mr. Burris the medication prescribed by Defendant Bibart, and ultimately finding that Defendant Joseph went

"above and beyond." (Furlong Policy and Training Review, D.101-3, PID#2803).

Defendant Sheriff Dodds is the final decision-maker for the discipline of corrections officers, including Joseph, and he signed off on the investigations and issued no discipline. (Dodds Dep., D.85, PID#1953, 1963-1964). He testified that he agreed with the findings of the Watson report, the Furlong Policy review, and the investigation by Hancock County. (*Id.,* PID#1992, 1994-1995, 1996-1997). Thus, the approval of Defendant Joseph's actions by Defendant Sheriff Dodds is evidence that her actions *were* consistent with existing Jail policy. This is not merely an *ex post facto* approval, because there is evidence that this policy and practice existed before Mr. Burris' admission to the Logan County Jail. Detainees suffering alcohol withdrawal are regularly denied treatment, denied transfer to a hospital, and undertreated. (Mendel Report, D.74-2, PID#1462-3). The treatment (and lack of treatment) of Mr. Burris was consistent with how patients suffering from alcohol withdrawal are treated at the Logan County Jail. (Costin Dep., D.27, PID#418 (agreeing Burris was treated "in the same manner as other inmates suffering from alcohol withdrawal"); Joseph Dep., D.29, PID#700 (agreeing she treated Burris "in a manner similar to the way [she] treat[s] other inmates who've gone through alcohol and drug withdrawal")). The ratification of the conduct of the jail staff only further confirms that their conduct complied with Jail policies and practices and as a result, summary judgment must be denied.

### 3. Defendant Logan County Failed to Adequately Supervise its Staff to Treat Detainees Experiencing Withdrawal.

Additionally, Defendant Logan County is also liable because it maintained a policy of inadequate supervision. "To succeed on a failure to train or supervise claim, the plaintiff must prove that: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis ex rel. Pendergrass v. Cleveland Mun. School*

*Dist.*, 455 F.3d 690, 700 (6th Cir. 2006). Defendants assert that a "generalized" failure to train or supervise is insufficient, but do not explain how that supports summary judgment here and do not make any argument that the undisputed facts support summary judgment. This fails to meet Defendants' initial burden to prove that no genuine issue of material fact exists. Regardless, because there is evidence a jury could rely on to find that Logan County failed to adequately supervise its staff, and that inadequacy caused the constitutional violations Mr. Burris suffered, summary judgment must be denied.

Here, the supervision of the nursing staff and corrections officers was inadequate to the tasks they were expected to perform – treating or obtaining treatment for detainees suffering from severe alcohol withdrawal. Nursing staff was not given any guidance on when they needed to assess persons on site, rather than remotely relying on corrections officers. (Costin Dep., D.27, PID#433). In fact, Defendant Bibart testified that she regularly relies on corrections officers to make medical assessments, despite acknowledging that she knew it was not right to do so.  (Bibart Dep., D.32, PID#1063; Bibart Interview Tr., D.100-3, PID#2776).

Additionally, there was widespread failure to comply with procedures staff had supposedly been trained on, indicating that while training was provided, there was a lack of supervision to ensure that staff was following training and a practice of staff not following their training. Defendant Sheriff Dodds and Fitzpatrick agreed that the failure of Defendants Joseph, Roberts, and Fullerton to take vitals while Mr. Burris was in the restraint chair was a violation of their training. (Dodds Dep., D.85, PID#1978-1979; Fitzpatrick Dep., D. 86, PID#2039-2040). Defendants Dodds and Costin, and Fitzpatrick and Torsell agree that Defendant Joseph violated her training when she failed to call the nurse back. (Fitzpatrick Dep., D.86, PID#2042; Torsell Dep., D.83, PID#1840, 1844; Costin Dep., D.27, PID#413; Dodds Dep., D.85, PID#1964-1965).

Defendant Costin and Fitzpatrick agree that Defendant Joseph violated her training when she gave medication without authorization from a nurse. (Fitzpatrick Dep., D.86, PID#2041-2042; Costin Dep., D.27, PID#413). Defendant Dodds even agrees she should have been disciplined for it, however she was not. (Dodds Dep., D.85, PID#1964). There were also numerous policy violations. The use of force policy only allows for use of the restraint chair when "all other reasonable means" have been exhausted to safely restrain violent, suicidal, and combative offenders, but Mr. Burris was not violent, suicidal, or combative. (D.29-1, PID#771; Joseph Dep., D.29, PID#564). Alternatively, restraints may only be applied under the medical policy to "control otherwise physically uncontrollable disturbed individuals." (D.33, PID#1233). However, there is no evidence to support that Mr. Burris was physically uncontrollable and disturbed and Defendant Joseph did not obtain medical authorization for the use of the restraint chair. (Joseph Dep., D.29, PID#605-606). While Defendant Joseph admitted that jail policy required that the nurse be called before placing someone in a restraint chair, she further testified that the policy is not typically followed at Logan County Jail. (*Id*., PID#662-663). And Defendant Dr. Costin agreed. He considers the restraint chair policy "overstated" and testified that he does not expect it to be followed by staff.  (Costin Dep., Doc. 27, PID#395). Further, Defendants Joseph, Roberts, and Fullerton acted in violation of Logan County Jail policy, because Jail staff should have checked on Mr. Burris every 10 minutes, and medical personnel should have performed checks on Mr. Burris every 30 minutes while he was restrained. (D.33, PID#1234). Despite the multiple, egregious violations of the Logan County jail policies and training, no one was disciplined for their actions the night Ricky Burris died. (Dodds Dep., D.85, PID#1953-1954, 1956). This failure to discipline for obvious violations supports the fact that a lack of supervision existed in the Logan County Jail and the fact that violations of policy and training were tolerated by the County.

Further this inadequacy was the result of deliberate indifference. While Defendants argue that *Samples* is distinguishable, the deliberate indifference prong of a municipal claim can be met by showing that the municipality failed "to provide adequate training in light of foreseeable consequences that could result from a lack of instruction." *Ellis*, at 700-701. The Logan County Jail regularly sees detainees going through withdrawal. (Joseph Dep., D.27, PID#547). A certain number of those will be severe. Defendants Costin and Dodds knew that severe alcohol withdrawal was a serious medical need and could be fatal. (Costin Dep., D.27, PID#351). As a result, it was foreseeable that a failure to adequately supervise staff would result in failures to adequately treat detainees suffering from severe alcohol withdrawal. Summary judgment must be denied.

### E.  Plaintiff's State Law Claims Must Proceed to Trial.

Under Ohio Rev. Code § 2744.03(A)(6), a municipal employee is immune from liability to state law torts unless the employee acted "with malicious purpose, in bad faith, or in a wanton or reckless manner." "[R]eckless conduct is characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Anderson v. Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, 983 N.E. 2d 266, ¶ 34. The issue of recklessness is normally a question of fact to be determined by the jury. *Chesher v. Neyer*, 477 F.3d 784, 800 (6th Cir. 2007); *Chavalia v. City of Cleveland*, 2017-Ohio-1048, 87 N.E.3d 705, ¶ 33 (8th Dist.).

This Court followed the subjective deliberate indifference analysis in resolving Plaintiff's state law claims, granting summary judgment to the Defendants who were granted summary judgment on the constitutional claims, and denying summary judgment to Defendant Roberts, who was not granted summary judgment on the constitutional claims. (Order, D.111, PID#3021-3022). However, recklessness under Ohio law is not comparable to subjective recklessness, the standard

adopted by *Farmer* as the Eighth Amendment standard, but rather is the standard adopted in *Brawner* for Fourteenth Amendment medical claims. *Brawner*, 14 F.4th at 596, citing *Farmer*, 511 U.S. at 836, citing Restatement (Second) of Torts § 500 (1965); *Anderson*, 134 Ohio St.3d 380, ¶ 34, citing Restatement (Second) of Torts § 500 (1965). Thus, for the same reasons that Defendants Joseph, Bibart, Roberts, Fullerton, Dodds, and Costin should be denied summary judgment under *Brawner*, they should also be denied summary judgment on Plaintiff's state law claims.

In Defendants' original Motion, they did not move for summary judgment on the claim against Defendant Dodds, nor do they do so in this Motion. (Motion, D.119, PID#3095-3096). However, he can be held liable for his reckless conduct as a supervisor. *Plush v. City of Cincinnati*, 2020-Ohio-6713, 164 N.E.3d 1056 , ¶¶ 37-40 (1st Dist.). Therefore, he is not entitled to summary judgment. As to Defendants Joseph, Roberts, and Fullerton, they are not entitled to summary judgment because a jury could find that they acted recklessly, for all the same reasons that they could be found to have acted recklessly under the Fourteenth Amendment. Defendants' argument that they took "reasonable steps to care for Mr. Burris" is disputed and these claims must go to a jury. Finally, Defendants argue that Defendants Bibart and Costin acted within their respective standards of care, that Mr. Burris' death was not the proximate result of their actions, and that no patient-doctor relationship existed between Burris and Defendant Dr. Costin. However, Defendants are incorrect on every point. Dr. Mendel[6] opined that Defendant Bibart's actions were a "marked deviation from the applicable standards of care" and "directly contributed to the adverse outcome in this case." (Mendel Report, D.74-2, PID#1467, 1471). Mendel also opined that

---

[6] Defendants argue that "[w]ithout a nursing expert, Plaintiff cannot establish Bibart's breach, (Motion, D. 119, PID#3096), however while it is true that expert testimony is necessary, the expert does not need to be a nurse. Dr. Mendel, as a physician, is qualified to opine on the standard of care for nurses. *Berdyck v. Shinde*, 66 Ohio St.3d 573, 581-582 (1993) (describing testimony of two experts, both physicians, on nurses' standard of care).

Defendant Costin's reliance on Clonidine as a practice deviates from the standard of care and that

Mr. Burris suffered unnecessarily as a result. (*Id.*, PID#1468). Thus, there is a dispute as to whether

Bibart and Costin breached the applicable standard of care and that they caused Mr. Burris'

injuries. In addition, a jury could find they acted recklessly for all the same reasons that they could

be found to have acted recklessly under the Fourteenth Amendment. Further, whether a physician

was in direct contact with the patient is not determinative. The "physician-patient relationship, and

thus a duty of care, may arise from whatever circumstances evince the physician's consent to act

for the patient's medical benefit." *Lownsbury v. VanBuren*, 94 Ohio St.3d 231, 238 (2002). Thus,

because Defendant Costin was responsible for establishing the jail medical policies, he was

consenting to act for the medical benefit of all Logan County detainees, including Mr. Burris, and

he can be responsible for those acts if he breached his duty of care.

## III.   CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests this Court deny Defendants'

Motion for Summary Judgment in its entirety.

Respectfully submitted,

| s/ Alphonse A. Gerhardstein<br>Alphonse A. Gerhardstein (0032053)<br>Trial Attorney for Plaintiffs<br>Friedman, Gilbert + Gerhardstein<br>441 Vine Street, Suite 3400<br>Cincinnati, Ohio 45202<br>Tel: (513) 621-9100<br>Fax: (513) 345-5543<br>al@FGGfirm.com | Tina McFall (0082586)<br>Marc Triplett (0021222)<br>Attorneys for Plaintiff<br>Triplett, McFall & Wolfe Law, LLC<br>332 S Main St<br>Bellefontaine, OH 43311<br>(937) 593-6591<br>Fax (937) 593-2867<br>mcfall@tmwlawyers.com<br>triplett@tmlawyers.com |
|---|---|

**CERTIFICATE OF SERVICE**

I hereby certify that on July 6, 2022, a copy of the foregoing pleading was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. I further certify that a copy of the foregoing pleading and the Notice of Electronic Filing has been served by ordinary U.S. mail upon all parties for whom counsel has not yet entered an appearance electronically.

s/ Alphonse A. Gerhardstein
Alphonse A. Gerhardstein